UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JAMES FRAZEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:16-cv-00005-SEB-DML |
| | ) | |
| DEARBORN COUNTY SHERIFF'S | ) | |
| DEPARTMENT, TIMOTHY ALBRIGHT | ) | |
| in his individual capacity, and TERRY | ) | |
| BUTLER in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

Plaintiff James Frazee ("Frazee") brought this action under 42 U.S.C. § 1983 asserting constitutional and state-law torts arising from Frazee's detention in the Dearborn County, Indiana, jail. Frazee has sued the Dearborn County Sheriff's Department ("the Sheriff's Department") and two special deputies of the Sheriff's Department, Timothy Albright ("Albright") and Terry Butler ("Butler") (together, "Defendants").

Pending before the Court is Defendants' motion for summary judgment on all claims [Dkt. 43]. For the reasons stated below, that motion is granted in part and denied in part.

## Background

The designated admissible evidence, with all reasonable inferences drawn and all evidentiary conflicts resolved in Frazee's favor, reveals the following. In early 2014, Frazee was a sixty-two-year old man who suffered from a few painful health problems. Some years before, Frazee had been diagnosed with a knee problem in his right knee that required knee-replacement surgery, but he elected not to receive the surgery. Instead Frazee chose to use a cane and prescription medication to manage his knee pain. Frazee has also suffered from gout, which, when it flares up, sharply exacerbates his knee pain to the point that he is unable to bear even touching his knee. Frazee has treated his gout with prescription medication as well.

On November 14, 2013, Frazee was arrested and charged with battery. For approximately ten weeks, from November 14, 2013, to January 27, 2014, Frazee was detained in the Dearborn County jail. During his detention, Frazee did not have his cane (he had left it at home when he was arrested, believing he would not be permitted to bring it with him into the jail), but his knee pain was manageable enough at the time not to limit substantially his physical activity while he was detained. Frazee did, however, file six requests for medical treatment during the weeks he was in jail, five requesting refills for his prescriptions to treat his knee pain, and one for a toothache. The jail doctor twice denied Frazee's request for a Naproxen prescription, but Frazee's other prescriptions were filled and administered. Frazee does not complain of the jail doctor's treatment of him.

On January 27, 2014, Frazee was scheduled to be transported from the jail to the Dearborn County courthouse to attend a change of plea hearing. Detainees in the

Dearborn County jail are shackled while being transported to the courthouse, according to standard procedures, and an inmate must ordinarily kneel on a chair to facilitate jail officers' efforts to shackle him. On this occasion, Frazee informed a jail officer that his knee hurt to "put force on it" and that he therefore could not kneel. Frazee Depo. (Dkt. 44 Ex. I) 70:9. So the officer allowed Frazee to stand while the officer shackled him. Frazee asked the officer to provide him with a wheelchair, but the officer did not secure one for him, even though wheelchairs were available and readily accessible at the jail for this purpose.

Butler and Albright were both special sheriff's deputies who were on duty that day. Butler's duties were limited to providing court security; he did not work at the jail regularly, and had never previously interacted with Frazee. Albright, too, had never seen or met Frazee before. The jail and the courthouse are connected by a 500-foot tunnel with two sets of stairs, each consisting of approximately six steps. Butler and Albright transported Frazee, who was shackled and handcuffed, along with other jail inmates through the tunnel to the courthouse. Frazee managed the walk without apparent difficulty. Before, during, and after the change of plea hearing at the courthouse, Frazee's movements were not affected or otherwise impeded by his knee pain. Frazee pleaded guilty and was sentenced to probation. After the hearing was concluded, Frazee was led out of the courthouse still shackled and handcuffed through the tunnel and back to the jail.

As they walked through the tunnel, Butler's position was only a few feet behind Frazee. Frazee appeared to be walking without problem when he suddenly tripped on one

of the flights of stairs and fell. Because he was handcuffed, Frazee was unable to slow or stop his fall, and he landed face-first onto the concrete. Frazee suffered bloody, visible injuries to his face and hands. Butler and Albright helped him up to a standing position and assisted him on his walk for the remainder of the way back to the jail. A jail nurse examined Frazee and treated his injuries with ice and ibuprofen. The nurse recommended x-rays, but Frazee refused to allow jail staff to transport him to a hospital. Frazee signed a *Refusal of Treatment Medical Release Form* and was released to probation, consistent with the sentence that had just been imposed.

This lawsuit followed. Frazee brings one constitutional claim against Butler[1] for violation of his Fourth and Eighth Amendment rights, and one negligence claim against Albright, Butler, and the Sheriff's Department. Defendants' motion for summary judgment is fully briefed and ripe for decision.

## Standard of Decision

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate

---

[1] Frazee's amended complaint advanced his constitutional claim against both Butler and Albright, Dkt. 23, p. 5, but, as explained more fully below, Albright has been dismissed from that claim by stipulation. Dkt. 40, 42.

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*,

573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

**Analysis**

We begin by delineating the summary judgment materials that are currently before

us before turning to an analysis of Frazee's constitutional and negligence claims. As

explained more fully below, because no reasonable fact-finder could find for Frazee on

this record as to his constitutional claim, Defendants are entitled to judgment as a matter

of law on that issue. Albright and Butler are entitled to judgment as a matter of law on his

negligence claim, but the Sheriff's Department is not.

**I.    Frazee's *Amended Affidavit* Must Be Disregarded**

Defendants contend that, at least at this stage of the proceedings, Frazee is not

entitled to rely on his assertion that it was Butler, rather than another, unidentified jail

officer, of whom Frazee made the request for a wheelchair and who denied that request

prior to Frazee's walk to the courthouse on January 27, 2014.[2] Defendants rest their

contention on the so-called "sham affidavit" rule that holds that a nonmovant cannot

resist summary judgment by contradicting his earlier deposition by his later affidavit

unless "it is demonstrable that the statement in the deposition was mistaken, perhaps

because the question was phrased in a confusing manner or because a lapse of memory is

---

[2] As will become clear from the merits discussion below, the identity of this jail officer is
critically important to the viability of Frazee's constitutional claim and of his negligence claim
against Albright and Butler, personally.

in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). This rule is to be applied with "great caution," *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996), based on the fact-finder's exclusive province, on the one hand, to weigh the evidence, including at "which point in time and with which words the witness . . . was stating the truth[,]" and, on the other, "[t]he purpose of summary judgment . . . to separate real, genuine issues from those which are formal or pretended." *Id.* at 1170 (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)).

In support of their invocation of the "sham affidavit" rule, Defendants cite Frazee's July 29, 2016, deposition testimony, as follows:

> Q.  [When you fell,] you said there were two males that were transporting you?
>
> A.  Yes.
>
> Q.  Do you remember what their races were?
>
> A.  They were white.
>
> Q.  Do you remember if they had facial hair or anything like that?
>
> A.  I know one guy was older. I can't remember the other guy.
>
> Q.  And you don't recall their names?
>
> A.  No.
>
> Q.  Would you be able to recognize them if you saw them?
>
> A.  The one I would.
>
> Q.  And did you ask them for a wheelchair on that day?
>
> A.  I know I—I don't know if I asked them, but I did ask somebody.
>
> Q.  You did ask somebody that day?
>
> A.  Yes.

Q. And would you recognize that person if you saw them?

A. No, I couldn't. Like I said, there was . . . more than just three or four, there is four or five or six of them running around somewhere. . . .

Q. The somebody that you asked for a wheelchair, was that person male or female?

A. Male I think. To my recall, male, because I don't remember no women. And, you know, like I said, there might have been three people that went over there, but I do know two of them were older deputies.

Q. And the person that you asked for the wheelchair, would it have been one of the older deputies?

A. I can't recall. . . .

Q. And was it a white male that you asked?

A. Yes. There ain't no blacks over there. . . .

Q. The two white older guards are the ones who took you over to the jail that day?

A. Yes.

Q. But you can't say if it was one of those two gentleman that you asked for a wheelchair?

A. No.

Q. You said no, you cannot say that it was one of the two of them?

A. I can't say if it's one of them or not. I'm not positive to be able to say yes or no.

Frazee Depo. (Dkt. 46 Ex. 2) 99:22–100:22; 101:10–19, 23–24; 102:5–14.

Thereafter, on November 7, 2016, Frazee executed an *Affidavit*, wherein he averred as follows:

On October 20, 2016, I attended a settlement conference . . . .
Terry Butler and Timothy Albright (two of the named defendants) were in attendance at this conference.

> Upon seeing Mr. Albright, I recognized him as one of the individuals I requested a wheelchair from on the day that I fell down the stairs.

Frazee Aff. (Dkt. 48 Ex. O) ¶¶ 7–8. On February 8, 2017, Frazee executed an *Amended Affidavit*:

> On October 20, 2016, I attended a settlement conference . . . . Terry Butler and Timothy Albright (two of the named defendants) were in attendance at this conference.
>
> Upon seeing Mr. Butler (not Mr. Albright), I recognized him as one of the individuals I requested a wheelchair from on the day that I fell down the stairs.

Frazee Am. Aff. (Dkt. 46 Ex. 1) ¶¶ 7–8. In opposition to summary judgment, Frazee relies on the *Amended Affidavit*. Pl.'s Br. Opp., p. 5, ¶¶ 3–4.

In his deposition, Frazee testified that it was a "white male" guard from whom he had requested a wheelchair, Frazee Depo. (Dkt. 46 Ex. 2) 101:23–24, but that he could not "positive[ly]" recall whether it was one of the "two white older guards" who transported him from the jail to the courthouse. *Id.* 102:5, 102:13–14. This testimony generally reflects a lack of knowledge on Frazee's part, rather than a positive identification which he later contradicted. Thereafter, upon having an opportunity to see the guards again who had transported him, Albright and Butler (Butler appears to be "older," *id.* 102:5, with forty years' law-enforcement and security experience, Butler Depo. (Dkt. 44 Ex. M) 3:18–4:4), Frazee identified Albright as the white male guard. This "lapse of [Frazee's] memory" which apparently was refreshed at the settlement conference "is in the circumstances a plausible explanation for the discrepancy" between Frazee's deposition and his *Affidavit*. *Acme-Evans*, 51 F.3d at 68.

The *Amended Affidavit*, however, takes on a different cast. Given its flat contradiction of the *Affidavit* without any explanation for the change of view, it comes well within the sham-affidavit rule. "It is easy to determine that an affidavit produced in response to a summary judgment motion in contradiction of a prior [sworn] statement is a 'sham' because such an affidavit is not difficult to produce and because it pops up in the immediate context of summary judgment." *Allied Signal*, 75 F.3d at 1173 (Cudahy, J., concurring); *see also United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) ("[T]he sham-affidavit rule applies only when a change in testimony is incredible and unexplained[.]" (quotations omitted)). So it is here. On first blush, because Frazee is suing both Albright and Butler, Frazee appears to gain no litigation advantage by switching stories a second time, and Frazee might have been permitted to rely on the *Amended Affidavit* in place of the *Affidavit* for that reason. But the chronology recorded in the docket tells a different story.

The *Affidavit* was executed on November 7, 2016. Dkt. 48 Ex. O. On January 5, 2017, the parties submitted a joint motion to dismiss Frazee's constitutional claim against Albright. Dkt. 40. We granted the motion on January 6, 2016. Dkt. 42. Defendants moved for summary judgment promptly thereafter, on January 17, 2017. Dkt. 43, 44. In responding to this motion, Frazee executed the *Amended Affidavit* on February 8, 2017, Dkt. 46 Ex. 1, five days before filing his opposition brief in response to summary judgment. Dkt. 46. Frazee points to, and we perceive, no intervening event (such as another settlement conference) or newly disclosed evidence that might plausibly explain the discrepancy between the *Affidavit* and the *Amended Affidavit*. Indeed, the two

affidavits are textually identical, down to the misplaced comma after "Since" in Paragraph Five, except that the *Amended Affidavit* exchanges the words "Mr. Albright" for the words "Mr. Butler (not Mr. Albright)" in Paragraph Seven. *Compare* Dkt. 48 Ex. O ¶¶ 1–8 *with* Dkt. 46 Ex. 1 ¶¶ 1–8. Though no factual or evidentiary explanation for the change in testimony has been provided, the benefit it supplies to Frazee's litigation position is clear: having stipulated to the dismissal of Albright from his constitutional claim, Frazee faced Defendants' summary judgment motion without a named defendant who could be held responsible for the constitutional consequences, if any, of denying him a wheelchair. The *Amended Affidavit* was plainly designed to solve this problem and no *genuine* issue of fact exists.

Accordingly, we conclude that the *Amended Affidavit* is not properly before us and must be disregarded. The *Affidavit* would be properly before us had Frazee relied on it in opposition to Defendants' summary judgment motion, but he does not. Thus, on this issue, we are left with Frazee's deposition testimony and any reasonable inferences it may give rise to in Frazee's favor.

## II.    Eighth Amendment Standards Govern Frazee's Constitutional Claim

In his complaint, Frazee alleges "Violation of the Fourth & Eighth Amendment[s]" by the "individual Defendants," Albright and Butler. Pl.'s Am. Compl., p. 5. Frazee alleges further that he "had the right to be free from unreasonable search[es] and seizures prior to his conviction [obtained by guilty plea at Frazee's change of plea hearing] under the 4th Amendment[,]" *id.* ¶ 45, and "the right to be free from cruel and

unusual punishment under the 8th [A]mendment after he was convicted and sentenced [at the change of plea hearing]." *Id.* ¶ 46.

In the Seventh Circuit, the Fourth Amendment governs the state's conduct following a warrantless arrest only until a judicial finding of probable cause has been made. *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). Thereafter, the state's conduct is governed by the Due Process Clause of the Fourteenth Amendment up until the time of conviction. *Id.* Following a conviction, the Eighth Amendment controls. *Id.*

After his warrantless arrest, Frazee appeared before a judicial officer on November 15, 2013, who found probable cause to detain him pending trial. Dkt. 44 Ex. N. The Fourth Amendment's applicability thus ended at the time of that determination. None of the conduct Frazee complains of occurred over the two-day period between his November 14, 2013, arrest, and his November 15, 2013, initial hearing. Therefore, Frazee has no assertable Fourth Amendment violation.

Given the timing of Frazee's walk to and from the courthouse, and the fact that he was adjudicated guilty and sentenced during that court proceeding, there is some question as to whether the Eighth Amendment or the Due Process Clause controls Frazee's constitutional claim. *See Lopez*, 464 F.3d at 719. However, because the relevant standards in this context are applied identically, we need not address this issue further. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664–665 (7th Cir. 2012). More specifically, the protections afforded to pretrial detainees by the Due Process Clause "are at least as broad as those that the Eighth Amendment affords to convicted prisoners[.]" *Id.* at 664. Due process protections may be greater, but the Supreme Court has "not yet

determined" by how much, and in what ways, if at all. *Id.* In any event, because Frazee

has not brought his claim under the Due Process Clause, because he does not dispute the

Eighth Amendment's applicability, and because he has not offered any reason why the

Due Process Clause would afford him greater protection, we shall analyze Frazee's

constitutional claim under Eighth Amendment principles.

### III.  Frazee's Eighth Amendment Claim Fails

The Eighth Amendment protects persons under sentence against cruel and unusual

punishments. U.S. Const. amend. VIII, cl. 3; *Berry v. Peterman*, 604 F.3d 435, 439 (7th

Cir. 2010). This protection embraces prohibitions on "the unnecessary and wanton

infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), and on conditions of

confinement that "deprive inmates of the minimal civilized measure of life's necessities."

*Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "A [jail] official's deliberate indifference

to a substantial risk of serious harm to an inmate violates" these prohibitions. *Farmer v.

Brennan*, 511 U.S. 825, 828 (1994) (quotations omitted).

Analysis of a claim for deliberate indifference in denying a medical

accommodation proceeds in two steps, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d

650, 664 (7th Cir. 2012), reflecting the objective and subjective components of the claim.

*Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). First, the plaintiff must show an

objectively serious risk to his health or safety if the accommodation is withheld. *Estate of

Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) ("'[There must be] a deprivation

that is, from an objective standpoint, sufficiently serious that it results in the denial of the

minimal civilized measure of life's necessities'[;] . . . [u]nacceptable conditions include

those that pose a 'substantial risk to inmate health or safety.'" (citations omitted)), 747

("A claim of deficient medical care requires proof of an objectively serious medical

condition[.]").

Second, the plaintiff must show the jail official's subjective deliberate indifference

to that risk. *Id.* at 745, 747. The jail official must "know[] of and disregard[] an excessive

risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference." *Knight v. Wiseman*, 590 F.3d 458, 464 (7th Cir. 2009) (emphasis

omitted) (quoting *Farmer*, 511 U.S. at 837). The jail official's state of mind is "subject to

demonstration in the usual ways, including inference from circumstantial evidence, and a

factfinder may conclude that [the jail official] knew of a substantial risk from the very

fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted).

Here, Frazee contends that "Butler violated [his] Eighth Amendment rights by

failing to provide him the use of a wheelchair on January 27, 2014." Pl.'s Br. Opp., p. 10.

Frazee also points to Defendants' failure to "provide[] [any] medical attention to Frazee

other than to give him ice" after his fall, *id.*, p. 6, ¶ 12, *see also* Pl.'s Am. Compl. ¶ 52,

and to Butler's "fail[ure] to prevent [Frazee's] fall or catch him when he began to fall."

Pl.'s Br. Opp., p. 7, ¶ 18. We view the gravamen of Frazee's claim as the wheelchair

denial, so we address that issue first.

A.    Wheelchair Denial

Turning first to the objective component of this claim, Frazee and Defendants

dispute whether the combination of Frazee's gout and his longstanding knee problem

constituted an objectively serious medical condition. Defs.' Br. Supp., pp. 9–10; Pl.'s Br. Opp., pp. 12–14. We do not doubt that it did, *see Elyea*, 631 F.3d at 857 (stating test), but regard that as not quite the right question. The question is not whether Frazee's gout and knee problem, if left untreated, "would result in further significant injury or unnecessary and wanton infliction of pain . . . [,]" *id.*, because Frazee does not (and could not) complain that those conditions went untreated during his detention in the jail. Rather, the question before us is whether Frazee's transportation between the jail and the courthouse while handcuffed, shackled, and suffering from those chronic conditions presented an objectively serious risk to his health or safety, increasing the likelihood that he would trip and fall, such that denying him a wheelchair would result in the unnecessary and wanton infliction of pain.

On the evidentiary record compiled in this case, without engaging in impermissible speculation,[3] we conclude that no reasonable jury could conclude that it did. While the record supports an inference that serious injuries could result from falling while shackled and handcuffed, it does not support the inference of there being a serious chance that Frazee would fall while shackled and handcuffed.

The record reveals only one occasion on which Frazee had previously tripped and fallen as a result of his walking unsupported. Frazee testified as follows about his use of a cane:

---

[3] Because "the jury may not render a verdict based on speculation or guesswork[,]" *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946), "guesswork and speculation are not enough to avoid summary judgment." *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 692 (7th Cir. 2014) (quotations omitted).

Q.   How often do you use a cane? . . .

A.   Every day. It's—you know, especially when I got—it [*scil.*, my knee] swells up. And when it swells up then I really need a cane, or I might even have to use a crutch to lean on because it just gives out and stuff.

Q.   So each day you get up and you determine whether you need a cane or a crutch?

A.   No, I just—it all depends how bad my knee is bothering me to be able to use it. But I always have my cane with me because I don't want to be out in public and fall down in front of somebody. *Like I have when I got onto a bus before* and people seen me. It's embarrassing. . . .

Q.   You don't always take [your cane] with you when you're out walking, though?

A.   Yes, I take my cane with me because I don't ever know when I'm going to need it, especially if I'm going up stairs and I need it for support.

Q.   You're still able to walk up stairs?

A.   I don't usually walk up no stairs if I don't have to, because it gives out too bad.

Frazee Depo. (Dkt. 44 Ex. I) 13:15–14:25 (emphasis added). Frazee also testified that his knee "just gives out" sometimes, *id.* 13:24, but, other than the bus-embarkation incident referenced above, Frazee never reported having fallen as the result of his weakened knee.

Moreover, Frazee never reported his knee giving out or his falling during his jail detention prior to January 27, 2014. Frazee testified that, when his conditions "flare[d] up," *id.* 33:1, "you can't walk" and "it cripples you . . . ." *Id.* 33:10. Frazee testified that he could perceive when a flare-up was coming, *id.* 33:24–25, and he would tailor his activity accordingly. During his recreational time at the jail, Frazee said he would sometimes walk around the common area with the other inmates and sometimes not, depending on how he gauged his condition at the moment. *Id.* 54:2–55:5. At mealtimes,

Frazee would usually walk to get his own tray, *id.* 54:5–19, but sometimes, if the pain was too much to bear, another person would be allowed to deliver Frazee's tray to him. *Id.* 54:15–17. Frazee would walk from his cell to the jail library, using the elevator instead of the stairs, *id.* 55:8–23, walk around the library, select his books, and walk back to his cell. *Id.* 56:6–12.

Thus, while Frazee's movements about the jail were apparently sometimes painful to him, no evidence suggests that that pain seriously increased his chance of falling. Though Frazee submitted six requests for medical treatment while detained, five of them relating to the treatment of his knee pain, none of them requested a cane, a wheelchair, or any other walking assistance. Dkt. 44 Ex. F ("Dearborn County Jail Sick Call Request Form[s]").

Finally, and critically, Frazee never reported that his knee gave out, causing him to fall or almost fall, while walking shackled and handcuffed. Before January 27, 2014, Frazee had made two other trips to the courthouse from the jail using the tunnel. The first time, he was transported in a wheelchair. Frazee Depo. (Dkt. 46 Ex. 2) 64:5, 64:10–11. On that occasion, Frazee was given a wheelchair because jail officers saw him "limping and holding on to stuff" as he walked down the tunnel. *Id.* 64:14–18. The second time, Frazee walked the tunnel without assistance. He asked a jail officer for a wheelchair, but the officer "told [him] let's try it this way, more or less walk with the shackles instead of doing—instead of just helping [him]. . . . And she said let's try it this way, and more or less you walk with the shackles on." *Id.* 67:2–13.

About his third trip to the courthouse on January 27, 2014, Frazee testified that walking down steps while shackled was difficult for him because the shackles restricted his stride, forcing him to take short, shuffling steps:

> Q. Tell me what happened [when you fell].
>
> A. I was walking . . . . When I went to step—because you walk like this because you can't make your legs like this, . . . because you got the shackles on it and a chain coming up, and you have to go like this. Well, when I went to step down it didn't let my leg—to my knowledge I don't really—all I can tell you is when I went to go down the stairs I fell. . . .
>
> Q. Just so our record is clear, when you were saying that this is what you have to do, I'm going to try to describe that. You were saying that with the shackles you're not able to move your feet very far apart for each step; is that right?
>
> A. Right.
>
> Q. So you have to take shorter steps?
>
> A. Yes.
>
> Q. And if I understand what you're saying, you're saying that because of the shorter steps you had a problem going down the stairs?
>
> A. Yes.
>
> Q. Do you know in particular what caused you to fall?
>
> A. No.
>
> Q. Did you feel like you tripped over anything?
>
> A. No.

*Id.* 78:15–79:24. Frazee's memory was consistent with Butler's on this point: "[W]hen this incident happened I was right next to Mr. Frazee, and I seen his feet shuffle two or three times and he hit like three or four steps real quick, and then he fell face first. . . . I

actually seen him kind of, you know, make a quick shuffle . . . ." Butler Depo. (Dkt. 44

Ex. M) 11:23–12:7.

The designated evidence thus fails to support a reasonable, nonspeculative

inference of seriously increased chance of injury to Frazee *due to his knee pain* that was

greater than the ordinary risk of accident incurred by anyone who climbs down steps

while shackled and handcuffed. That ordinary risk of accident is presumably

constitutionally tolerable, or, put differently, does not present an objectively serious risk

to inmate health or safety as a matter of law. To rule that a reasonable fact-finder could

find in favor of Frazee on this point would imply that every shackled inmate deprived of

a wheelchair presents a looming Eighth Amendment violation, a "depriv[ation] . . . of the

minimal civilized measure of life's necessities[,]" *Rhodes*, 452 U.S. at 347, sufficient to

withstand a motion for summary judgment. That cannot be correct.

In *Estate of Simpson*, a panel of the Seventh Circuit considered whether placing an

obese jail inmate suffering from alcohol withdrawal in the upper bunk of a bunk-bed that

was only 30 inches wide presented an objectively serious risk to the inmate's health or

safety. 863 F.3d at 745–46. The court determined that, on the record before it, the

"argument that the bunk was unreasonably dangerous to [the inmate] rest[ed] almost

entirely on hindsight—that is," on the fact that the inmate later rolled off the bunk and

fell to his death. *Id.* at 746. So it is here. While an injury caused by falling onto the floor

while shackled and handcuffed is likely to be serious, the evidence before us does not

permit the reasonable inference that the chance of such an injury occurring to Frazee

posed a serious risk. Like the plaintiff in *Estate of Simpson*, Frazee "has not provided

evidence that (if accepted) would show the requisite level of risk and harm here." 863 F.3d at 746.

"In any event, even if we were to assume that a trier of fact could find in [Frazee's] favor on the objective part of the constitutional inquiry, [he] would still be out of luck[,]" *id.*, because the designated evidence before us would not permit a reasonable trier of fact to infer Butler's subjective deliberate indifference. The evidence, as we have noted, reveals little to establish a serious risk to Frazee if denied a wheelchair, but whatever that evidence was, Frazee has not shown that Butler was aware of any of it.

It is undisputed that, prior to January 27, 2014, Butler had not ever met Frazee, did not know him, and was not aware of his physical conditions. It is further undisputed that, on January 27, 2014, Butler did not acquire any direct knowledge of Frazee's physical conditions. Thus, Frazee must rely on the possibility that a reasonable fact-finder could circumstantially infer Butler's awareness of a risk to Frazee "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

No such inference is available here. "The risk of injury from a fall onto a concrete floor is obvious, but the chance that [Frazee] would fall is not." *Estate of Simpson*, 863 F.3d at 746. Before January 24, 2017, Butler had never seen anyone fall while shackled as he walked the tunnel passage between the jail and the courthouse. Butler Depo. (Dkt. 44 Ex. M) 11:11–13. Frazee points to his "obvious visual [i.e., visually obvious] physical frailties . . . ," Pl.'s Br. Opp., p. 15, but Frazee neither designates nor cites to any admissible evidence tending to show his frailties were visually obvious; he asks us simply to assume they were. On a motion for a summary judgment, that is not enough.

Finally, the evidence properly before us (that is, without the *Amended Affidavit*) does not support a nonspeculative inference that Butler heard Frazee say that his knee hurt as Frazee was being shackled, nor that he heard and denied Frazee's request for a wheelchair. By Frazee's account, "there is [*sic*] more than just three or four [jail officers around while jail detainees prepare for transport to the courthouse], there is [*sic*] four or five or six of them running around somewhere," Frazee Depo. (Dkt. 46 Ex. 2) 100:20–22, and Frazee could not remember who of this number shackled him, Frazee Depo. (Dkt. 44 Ex. I) 70:12, nor whom of this number he asked for a wheelchair. Frazee Depo. (Dkt. 46 Ex. 2) 100:13–19.

The designated evidentiary materials support no reasonable inference that Butler was aware of and disregarded a serious risk to Frazee's health or safety as he escorted him to and from the courthouse without a wheelchair or other walking support on the day of Frazee's fall.

### B.    Other Grounds

Nor can Frazee successfully rely on Butler's "fail[ure] to . . . catch him when he began to fall." Pl.'s Br. Opp., p. 6., ¶¶ 18–20. No evidence supports a reasonable inference that Butler did actually allow Frazee to fall. The only evidence in the record before us on this point is directly contrary to this inference:

> Q.    How far do you think you were from Mr. Frazee when he fell?
>
> A.    I was within probably two feet. Because I actually seen him kind of, you know, make a quick shuffle, and so I grabbed for his chain [connecting Frazee's shackles to

> his handcuffs]. But I missed it, and then he went on
> down the steps and fell forward.

Butler Depo. (Dkt. 44 Ex. M.) 12:3–9. This evidence, then, indicates that Butler reacted as quickly as he was able once he perceived Frazee to be in danger. This suffices to have discharged Butler's duty to "respond[] reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Put differently, "[jail] officials who act reasonably cannot be found liable" under the Eighth Amendment. *Id.* at 845. None of the designated materials support the conclusion that Butler did not act reasonably in reaction to seeing Frazee begin to fall.

Nor, finally, can Frazee gain any benefit from his own refusal of medical treatment after his fall. It is undisputed that Frazee was helped back to the jail after his fall; that a jail nurse treated him with ice and medicine; and that Frazee refused to be taken to the hospital and signed a *Refusal of Treatment Medical Release Form* before his release from the jail. Any injury that occurred to Frazee as the result of lack of immediate medical treatment was caused by *Frazee's* refusal of such treatment, not by the jail staff's deliberately indifferent failure to offer or give it. *See Isby v. Clark*, 100 F.3d 502, 505–06 (7th Cir. 1996) ("If feces were on the wall—but [plaintiff] put it there—the claim on this point that the defendants violated the Eighth Amendment would lose a lot of its steam.").

For these reasons, Defendants are entitled to judgment as a matter of law on Frazee's Eighth Amendment claim.

**III. Frazee's Negligence Claim Does Not Succeed Against Albright and Butler, But Does Survive Against the Sheriff's Department**

## A.    Albright[4] and Butler Are Personally Immune From Liability

Under the Indiana Tort Claims Act (ITCA), a "lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b); *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014). But if the employer answers that its employee acted outside the scope of his employment, a suit against the employee personally may proceed, Ind. Code § 34-13-3-5(b), if the complaint alleges an act or omission by the employee that is "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." *Id.* § 34-13-3-5(c).

Here, Frazee's complaint alleges that the Sheriff's Department "is vicariously liable for the actions of its employees." Pl.'s Am. Compl. ¶ 59. While the complaint does not specifically allege that Albright and Butler were acting within the scope of their employment with the Sheriff's Department on January 27, 2014, the only plausible legal basis for imposing vicarious liability in this context is *respondeat superior* liability for acts done within the scope of employment. *See Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008). And, though Defendants' Answer denied that allegation, *see* Defs.' Answer Am. Compl. ¶ 59, their Answer elsewhere admits that "the jail staff members were acting within the scope of their employment" at the times relevant to the complaint. *Id.* ¶ 50. Thus, Frazee's negligence claim against Albright and Butler is barred by the ITCA.

---

[4] As noted above, the parties stipulated to Albright's dismissal from Frazee's constitutional claim only.

But Albright and Butler have not actually raised this defense. They argue instead that "there is no evidence that they acted (1) criminally; (2) clearly outside the scope of their employment; (3) malicious[ly]; (4) willfully and wantonly; or (5) [in a way] calculated to benefit themselves personally." Defs.' Br. Supp., p. 14. Frazee responds that there is a fact issue precluding summary judgment as to whether Butler's (but not Albright's) conduct was willful and wanton. Pl.'s Br. Opp., p. 16. Frazee makes no effort to show that the designated materials could support a finding in his favor on one of the other four bases of an employee's personal liability under the ITCA. *Id.*

In Indiana, willful and wanton misconduct is

> either: 1) an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time; or 2) an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk. The elements of willful or wanton misconduct are: (1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and (2) the actor's conduct must have exhibited an indifference to the consequences of his conduct. Also, our supreme court has accepted that "wanton and willful" and "reckless" seem to imply the same disregard for the safety of others.

*Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204–05 (Ind. Ct. App. 2011) (quotations, citations, and alterations omitted).

The evidence before us fails to support a reasonable inference of willful and wanton misconduct by Butler. For the same reasons that the record does not support a finding of an objectively serious risk to Frazee's health or safety, it does not support a

finding that Frazee's fall was the natural and probable consequence of being denied a wheelchair. Further, the evidence is entirely lacking as to Butler's actual knowledge, including that he had any knowledge of Frazee's knee conditions, his knee pain on January 24, 2017, or his request for a wheelchair. In other words, there is no evidence that Butler knew of a natural and probable injury to Frazee without a wheelchair, or that he was conscious that his course of conduct was calculated to result in probable injury to Frazee. Nor is there any evidence that Butler's overall course of conduct exhibited an indifference to its consequences, to the extent that Butler attempted to prevent Frazee's fall after it began and assisted Frazee after he had fallen.

A reasonable fact-finder could not conclude that Butler acted willfully or wantonly toward Frazee, and Frazee does not contend that genuine issues of material fact preclude summary judgment in favor of Albright. Albright and Butler are therefore entitled to judgment as a matter of law on Frazee's negligence claim against each of them personally.

### B.    The Sheriff's Department May Be Sued and Held Liable

The Sheriff's Department contends that "[a] sheriff's department is a *department* of the County, not a separate governmental entity or a political subdivision. Because the Dearborn County Sheriff's Department is not a separate legal entity, it cannot owe a duty, or be liable for breach of any duty." Defs.' Br. Supp., p. 14. This is incorrect as a matter of law. *Porter Cnty. Sheriff Dep't v. Guzorek*, 857 N.E.2d 363, 372 (Ind. 2006) (holding sheriff's department subject to suit in ITCA case).

An Indiana sheriff's is an independent constitutional office, Ind. Const. art. VI, §

2(a), with an independent statutory duty to "take care of the county jail and the prisoners

there[.]" Ind. Code § 36-2-13-5(a)(7). County commissioners "do not have any control

over the acts of the sheriff and its officers" and are never vicariously liable for their torts.

*Donahue v. St. Joseph Cnty. ex rel. Bd. of Comm'rs*, 720 N.E.2d 1236, 1241 (Ind. Ct.

App. 1999) (citing *Carver v. Crawford*, 564 N.E.2d 330, 334 (Ind. Ct. App. 1990); *Delk

v. Bd. of Comm'rs*, 503 N.E.2d 436, 440 (Ind. Ct. App. 1987)); *see also Estate of Drayton

v. Nelson*, 53 F.3d 165, 167 (7th Cir. 1994) (affirming sanctions award for "frivolous"

suit against Marion County, Indiana, for alleged torts of Marion County sheriff because

"the Sheriff of Marion County is not employed by the County but is instead an

independent official for whose acts the County bears no responsibility under the law of

Indiana."); *Markley v. Walters*, 790 F. Supp. 190, 191 (N.D. Ind. 1992) ("[T]he Grant

County Sheriff is answerable to the voting citizens of Grant County, not to the Grant

County Council or its council members."). The office of an Indiana sheriff is not a mere

department of county government.

Moreover, an Indiana sheriff's department may be vicariously liable for the torts

of its employee committed within the scope of his employment. *Harrison Cnty. Sherriff's

Dep't v. Ayers*, 70 N.E.3d 414 (Ind. Ct. App. 2017) (reversing jury verdict for plaintiff

where sheriff's deputy's negligent act not within scope of employment); *Iglesias v. Wells*,

441 N.E.2d 1017, 1020 n.3 (Ind. Ct. App. 1982) ("If the deputies were negligent in their

official capacities, the Sheriff [sued here in his official capacity] is responsible for their

negligence . . . ."). This is so notwithstanding that the employee is personally immune

because his conduct does not satisfy the bases for personal liability under Indiana Code § 34-13-3-5(c), because the employee's "personal immunity from suit . . . is not transferable" to his employer. *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 254 (Ind. Ct. App. 2013); *see also* Ind. Code § 34-13-3-5(d) ("[T]he governmental entity shall pay any judgment of a claim or suit against an employee when the act or omission causing the loss is within the scope of the employee's employment, regardless of whether the employee can or cannot be held personally liable for the loss."). Frazee's complaint seeks to hold "[t]he Dearborn County Sheriff's Department . . . vicariously liable for the actions of its employees." Pl.'s Am. Compl. ¶ 59. The Sheriff's Department is not entitled to summary judgment on the basis that it is not an entity which may be liable for Frazee's injuries. No other grounds for summary judgment were advanced by Defendants in their motion.

## Conclusion

For the reasons above, Defendants' motion for summary judgment is GRANTED in favor of Albright and Butler on all state-law and constitutional claims.

Defendants' motion is DENIED as to the negligence claim against the Sheriff's Department. The case shall proceed accordingly.

IT IS SO ORDERED.

Date: ___10/17/2017___

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
lroberts@cchalaw.com

Charles C. Hayes
HAYES RUEMMELE LLC
charleshayes.atty@gmail.com

Kathleen M. Sweeney
SWEENEY HAYES LLC
ksween@gmail.com